**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

SHAWN ELLIOTT and JEREMIAH
WITTNER,

        Plaintiffs,

v.

TULSA CEMENT, LLC; KRISTOPHER
TODD BROWN; JAKE MEDRANO;
TOMMY KELLER; EAGLE MATERIALS,
INC.; and INTERNATIONAL
BROTHERHOOD OF BOILERMAKERS,
IRON SHIP BUILDERS, BLACKSMITHS,
FORGERS AND HELPERS,

        Defendants.

Case No. 18-CV-00164-GKF-JFJ

## OPINION AND ORDER

Before the court are the following motions: (1) the Motion to Dismiss [Doc. 20] of defendants Tulsa Cement LLC, Eagle Materials, Inc., and Jake Medrano; (2) the Motion to Dismiss [Doc. 23] of defendants Kristopher Todd Brown and Tommy Keller; and (3) the Motion to Remand [Doc. 37] of plaintiffs Shawn Elliott and Jeremiah Wittner.

## I.    Allegations of the Petition/Procedural History

Plaintiffs worked as hourly maintenance employees for defendant Tulsa Cement, LLC from 2013 until their termination on August 14, 2017. [Doc. 2-1, p. 3, ¶¶ 5-6 and 51]. Plaintiffs joined Local D421 of the Cement, Lime, Gypsum and Allied Workers Division of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers (hereinafter, "Union"). [*Id.* ¶¶ 5-6], and were subject to a collective bargaining agreement (CBA) between the Union and Tulsa Cement. [*Id.* ¶ 7].   Defendant Eagle Materials, Inc. is the parent corporation of Tulsa Cement LLC. [*Id.* ¶ 5].

Plaintiffs allege the following: Throughout 2014, manager Kris Brown and other managers repeatedly harassed, threatened, and intimidated plaintiffs. [*Id.* ¶ 8]. During one incident, Brown demanded Elliott perform mathematical calculations that were outside the scope of his employment and, when Elliott refused, Brown chased Elliott around a work bench while yelling threats. [*Id.*]. Elliott reported the incident to several people in management positions, including Keller. [*Id.* ¶ 9].

Following continued harassment and intimidation, in February 2015, Wittner sent an anonymous email to Eagle Materials' corporate counsel and Elliott contacted corporate counsel via telephone. [*Id.* p.4, ¶ 10]. Although the corporate counsel indicated an investigation was "ongoing" and that he would contact Elliott, no further communication occurred. [*Id.*]. On August 15, 2015, Elliott filed a grievance against Brown citing continued harassment. [*Id.* p. 4, ¶ 11]. On December 1, 2015, a Union representative, Clay Herford, visited the Local Union and told the Local Union committee he would get Local Union jobs back, but that he would not arbitrate the grievances against Tulsa Cement. [*Id.* ¶ 12].

In September 2016, Elliott became aware of a recorded conversation between two former employees of Tulsa Cement—one male and one female. [*Id.* ¶ 17]. Because the former female employee was in a romantic relationship with manager Medrano, Elliott played the recording for Medrano, who asked Elliott to delete the recording. [*Id.*].

In early April 2017, Elliott filed a grievance on behalf of himself and other employees alleging Tulsa Cement only paid its employees for 11 ½ hours during 12 hour shifts, instead of the full 12 hours required by the CBA. [*Id.* p. 6, ¶ 21]. On April 7, 2017, Elliott and Wittner, with other Tulsa Cement employees, did not clock out for lunch based on past practice and the CBA's requirement that shift workers be compensated for a thirty-minute lunch. However, upon arrival

back at work, Medrano informed Elliott of a new policy requiring all employees to clock out at lunch when leaving the property. [*Id.* pp. 6-7, ¶ 22]. Medrano later informed Elliott that he would not be paid for break time when he left Tulsa Cement property, but that hours would be added back to Elliott's paycheck to compensate for the unpaid lunch time. [*Id.* p. 7, ¶ 23]. Medrano then advised Elliott to stop clocking out for lunch. [*Id.*]. However, on May 31, 2017, Medrano informed Elliott that he must resume clocking out for lunch, and assured him that he would be paid for the time and not be disciplined. [*Id.* ¶ 25]. Nevertheless, on June 8, 2017, Medrano issued Elliott a second written warning for policy violations related to not clocking out for lunch. Elliott refused to sign the warning, partially on the basis that he was unaware of the first-step warning against him which the form indicated occurred nearly two years before on August 11, 2015. [*Id.* p. 8, ¶ 27]. Elliott raised the issue with manager Alan Gee and Ed Rankey, requested a copy of the policy regarding clocking out for lunch, and asked to be moved to a different supervisor. [*Id.* pp. 8-9 and 11, ¶¶ 29, 31, and 42].

On May 15, 2017, Tulsa Cement created a fifth shift, but did not place the extra jobs for bid as required by the CBA. [*Id.* p. 7, ¶ 24]. Additionally, on June 1, 2017, Tulsa Cement stopped paying double time after twelve hours worked in violation of the CBA. [*Id.* ¶ 26]. On or around June 22, 2017, Elliott filed three grievances "to address various issues that were affecting the work environment including overtime equalization, the company's failure to call Local Union members to cover call outs, and out of classification work." [*Id.* p. 9, ¶ 32]. On July 13, 2017, Medrano read aloud a new policy on clocking out when leaving work to have lunch, to which Elliott objected as violating the CBA. [*Id.* p. 11, ¶ 43].

In June 2017, supervisor Mikels issued a verbal warning regarding mobile phone usage at work to Wittner in front of several other employees. [*Id.* p. 8, ¶ 28]. When questioned regarding

company policies that required the use of mobile phones, Mikels stated that Tulsa Cement management was looking for reasons to get rid of several employees, including plaintiffs, and were forcing him to discipline the employees. [*Id.*]. Other incidents include: (1) a February 2017 incident in which Wittner requested his shift be rescheduled due to lack of childcare, which was approved, but throughout the weekend Keller complained about Wittner to other employees and later accosted Wittner in the breakroom and informed Wittner that he would receive a warning letter and have points assessed against him [*Id.* pp. 5-6, ¶ 18]; (2) on February 2, 2017, Brown screamed "where's the motherf****r," referring to Elliott [*Id.* p.6, ¶ 19]; and (3) on June 22, 2017, Keller accosted and cursed both plaintiffs for arriving to work too early and called several employees "n*****s" or "prairie n*****s" [*Id.* p. 9, ¶ 33]. With regard to the June 22, 2017 incident, the Local Union demanded a written record of the meeting, and received a letter "downplaying the incident and failing to list any disciplinary actions taken against Keller." [*Id.* p. 10, ¶ 35].

In July 2017, Brown told Elliott to light a smoke bomb and throw it at a table where maintenance employee Jason Nicholson was sitting. Elliott lit the smoke bomb and threw it in a metal rack instead. [*Id.* pp. 10-11, ¶ 39].

On July 9, 2017, another Tulsa Cement employee asked Elliott to find and play the recording of the conversation involving a female former Tulsa Cement employee that Medrano requested he delete. [*Id.* p. 10, ¶ 37]. Elliott recovered the recording, and Wittner played it over an external speaker because someone complained that they could not hear the recording. [*Id.*]. Keller asked Elliott to play the recording for he and Brown, and told graphic stories about the former female employee. [*Id.* ¶ 38]. On July 27, 2017, Tulsa Cement suspended Elliott and

Wittner without pay during an investigation of a sexual harassment allegations made by Medrano and his fiancé, the former female employee on the recording. [*Id*. p. 12, ¶¶ 46-47].

On August 14, 2017, Tulsa Cement terminated plaintiffs' employment. [*Id.* p. 12, ¶ 51]. On August 29, 2017, Local Union leaders filed grievances nos. 2917 and 3017 protesting the termination of Wittner and Elliott, respectively. [*Id.* p. 13, ¶ 54]. During a visit by Herford in November 2017, Herford did not appear for a meeting arranged with Local Union leaders and Elliott. [*Id.* p. 4, ¶ 13]. During that same visit, Herford attended a third-step grievance meeting wherein he informed the Local Union president that he would attempt to get half back pay and Local Union member jobs reinstated. [*Id.* p. 4, ¶ 14]. However, Local Union members were not privy to meetings between Herford and Tulsa Cement executives and were not told the result of the meetings. [*Id.* p. 5, ¶ 15]. Herford continued to refuse to process grievances or take grievances to arbitration. [*Id*.]. Herford traded plaintiffs' grievances for Union jobs. [Doc. 2-2, pp. 2-3, ¶¶ 97 and 99]. In early December 2017, local union leaders informed plaintiffs of their belief that the Union would not pursue grievance nos. 2917 and 3017. [Doc. 2-1, p. 13, ¶ 63]. "After losing all faith in the grievance process," plaintiffs requested to drop grievance nos. 2917 and 3017, and the grievances were dropped on December 7, 2017. [*Id.* p. 14, ¶¶ 64-65].

On July 31, 2017, Elliott filed complaint no. 14-CA-203404 with the National Labor Relations Board alleging unilateral changes to the CBA, wrongful discharge, wrongful discipline, and coercive statements. [*Id.* p. 12, ¶ 48]. On August 8, 2017, Elliott filed complaint no. 14-CA-203909 with the NLRB alleging unilateral changes to the CBA. [*Id.* ¶ 50]. On September 28, 2017, Elliott filed complaint no. 14-CA-207018 with the NLRB alleging wrongful discharge. [*Id.* ¶ p. 13, 58]. On October 3, 2017, Elliott filed complaint no. 14-CA-207282 with the NLRB alleging concerted activities of retaliation, discharge, and discipline. [*Id.* ¶ 59]. On October 27,

2017, the NLRB issued *Collyer* deferral letters for case nos. 14-CA-203404 and 14-CA-203909. [*Id.* ¶ 60]. The NLRB dismissed case no. CA-207282 on November 20, 2017. [*Id.* ¶ 61]. Elliott subsequently requested to withdraw complaint no. 14-CA-207018, which the NLRB approved on November 28, 2017. [*Id.* ¶ 62]. Additionally, on December 21, 2017, the NLRB denied the appeal of case no. 14-CA-207282. [*Id.* p. 14, ¶ 67].

Plaintiffs filed this case in the District Court of Rogers County on March 2, 2018, asserting claims for (I) unlawful termination/retaliation; (II) breach of contract for violation of the "Eagle Ethics" policy; (III) intentional infliction of emotional distress; and (IV) breach of the Collective Bargaining Agreement.[1] Tulsa Cement and Medrano removed the case to this court on March 26, 2018, pursuant to 28 U.S.C. § 1441(b) and 28 U.S.C. § 1331, arguing plaintiffs' claims are pre-empted by federal law. [Doc. 2]. Defendants Brown, Keller, Eagle Materials, and the Union consented to removal. [Doc. 2-7]. Plaintiffs subsequently moved to remand, asserting the court lacks subject matter jurisdiction. [Doc. 37].

Additionally, Tulsa Cement, Eagle Materials, and Medrano moved to dismiss all of plaintiffs' claims for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), primarily relying on pre-emption. [Doc. 20]. In a separate motion, Brown and Keller also moved to dismiss under Rules 12(b)(1) and 12(b)(6). [Doc. 23]. The court first considers plaintiffs' motion to remand.

---

[1] The Petition also includes "Count V" seeking punitive damages. However, under Oklahoma law, "[a] plea for punitive damages is generally considered to be an element of recovery of the underlying cause of action; it does not constitute a separate cause of action." *Rodebush ex. rel. Rodebush v. Okla. Nursing Homes, Ltd.*, 867 P.2d 1241, 1247 (Okla. 1993).

## II. Motion to Remand of Plaintiffs Shawn Elliott and Jeremiah Wittner [Doc. 37]

Defendants removed the case to this court pursuant to 28 U.S.C. § 1331, citing section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. [Doc. 2]. Defendants argue that the LMRA confers jurisdiction to federal courts over claims alleging violations of collective bargaining agreements. [Doc. 2, p. 3]. Plaintiffs seek remand to the District Court of Rogers County, arguing that the Petition asserts state law claims which are not pre-empted by the LMRA.[2]

"Federal courts are courts of limited jurisdiction; they must have a statutory basis for their jurisdiction." *Dutcher v. Matheson*, 733 F.3d 980, 984 (10th Cir. 2013). "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). The removing party bears the burden of establishing federal jurisdiction and there is a presumption in favor of remand. *Medellin v. CommunityCare HMO, Inc.*, 787 F. Supp. 2d 1259, 1263 (N.D. Okla. 2011).

Pursuant to 28 U.S.C. § 1441(a), "Congress has granted the federal courts removal jurisdiction to hear claims initially brought in state court if the federal district court could have exercised original jurisdiction." *Garley v. Sandia Corp.*, 236 F.3d 1200, 1207 (10th Cir. 2001). A district court has jurisdiction over a claim if it "aris[es] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.[3] "Generally, the 'well-pleaded complaint' rule requires that the federal question appear on the face of the plaintiff's properly pleaded complaint." *Garley*, 236

---

[2] Following withdrawal of plaintiffs' counsel effective September 12, 2018, it is unclear whether plaintiffs still seek remand. In plaintiffs' *pro se* appearance, plaintiffs stated "[former counsel] was the one who wanted to go to Rogers County and that wasn't by our directions. We are fully satisfied and would appreciate the court hearing this matter . . . ." [Doc. 58, p. 1]. However, because plaintiffs did not formally withdraw the motion to remand, the court considers the motion.

[3] Defendants do not cite or refer to 28 U.S.C. § 1332, the statutory basis for diversity jurisdiction, and therefore the court does not consider § 1332.

F.3d at 1207.  However, the Supreme Court recognizes an "independent corollary" to the well-pleaded complaint rule—the "complete pre-emption" doctrine.  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987).  Pursuant to complete pre-emption, "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'"  *Id.* (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987)).  That is, "once 'an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law.'"  *Garley*, 236 F.3d at 1207 (quoting *Williams*, 482 U.S. at 393).  Courts consistently apply complete pre-emption in cases raising claims under section 301 of the LMRA.  *Williams*, 482 U.S. at 393 ("The complete pre-emption corollary to the well-pleaded complaint rule is applied primarily in cases raising claims pre-empted by § 301 of the LMRA.").

Section 301 of the LMRA provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).  "It is well established that, by virtue of the complete pre-emption doctrine, claims alleging a breach of a CBA are considered to arise under § 301 even if they ostensibly are pleaded as state-law claims."  *Ortega v. N.M. Legal Aid, Inc*., 643 F. App'x 774, 777 (10th Cir. 2016) (unpublished)[4]; *see also Cumpston v. Dyncorp Tech. Serv., Inc.*, 76 F. App'x 861, 862 (10th Cir. 2003) ("To the extent that [a] claim is based on an alleged breach of the CBA, the claim is clearly preempted.") (citing *Garley*, 236 F.3d at 1210)); *Carroll v. City of Albuquerque*, 749 F.

---

[4] "Unpublished decisions are not precedential, but may be cited for their persuasive value."  10th Cir. R. 32.1(A).

Supp. 2d 1216, 1223-24 (D.N.M. 2010) ("The Tenth Circuit has explained that section 301 'preempts questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, . . . whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.'") (quoting *Cisneros v. ABC Rail Corp.*, 217 F.3d 1299, 1302 (10th Cir. 2000)).

Count IV of the Petition asserts a claim for breach of the collective bargaining agreement. [Doc. 2-1, pp. 19-25 ,¶¶ 85-95; Doc. 2-2, pp. 1-4, ¶¶ 96-101]. Thus, count IV is "founded directly on rights created by" the CBA, and liability under the claim is dependent upon interpretation of the CBA. *Cf. Williams*, 482 U.S. at 396 ("[A] plaintiff covered by a collective-bargaining agreement is permitted to assert legal rights independent of that agreement, including state-law contract rights, *so long as the contract relied upon is not a collective-bargaining agreement*.") (emphasis altered from original).[5]

Plaintiffs urge the court to apply the four-factor *Grable & Sons* test to determine federal question jurisdiction. *See* [Doc. 47, p. 6 (citing *Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195 (10th Cir. 2012)]. However, in *Devon Energy*, the Tenth Circuit applied the *Grable & Sons* test <u>only after</u> first determining that the complete pre-emption exception to the well-pleaded complaint rule did not apply. *Devon Energy Prod. Co., L.P.*, 693 F.3d at 1208. Because complete pre-emption is available, the court need not apply the *Grable & Sons* test. Nor are the other cases cited by plaintiffs persuasive because the cases do not discuss complete pre-

---

[5] For this reason, *Karnes v. Boeing Co.*, 335 F.3d 1189 (10th Cir. 2003)—cited by plaintiffs—is distinguishable. In *Karnes*, plaintiff brought a claim alleging that Boeing violated Oklahoma's Drug Testing Act and Oklahoma's Employment Security Act of 1980 by failing to "uniformly apply" the company's anti-drug policy. *See Karnes*, 335 F.3d at 1193-94. The court noted that whether the policy had been uniformly applied was a "purely factual inquiry" and not "inextricably intertwined" with the terms of the collective bargaining agreement. *Id.* at 1193. Significantly, plaintiff did not assert a claim for breach of the collective bargaining agreement itself.

emption in the context of the LMRA. *See* [Doc. 47, pp. 6-7 (citing *Ry. Labor Execs. Ass'n v. Pittsburgh & Lake Erie R.R. Co.*, 858 F.2d 936 (3d Cir. 1988) and *Schmeling v. Nordam*, 97 F.3d 1336 (10th Cir. 1996)]. *See also Williams,* 482 U.S. at 393 ("The complete pre-emption corollary to the well-pleaded complaint rule is applied primarily in cases raising claims pre-empted by § 301 of the LMRA.").

Plaintiffs' count IV, breach of collective bargaining act claim, asserts a violation of, and is grounded in, the terms of the CBA. Therefore, the claim is considered to arise under § 301 of the LMRA and removal is appropriate. *Ortega,* 643 F. App'x at 778. "Federal question jurisdiction exists even if federal law preempts only one of Plaintiffs' 'state-law' claims." *Letbetter v. Local 514, Transp. Workers Union of Am.*, No. 14-CV-00125-TCK-FHM, 2014 WL 4403521, at *3 n.3 (N.D. Okla. Sept. 5, 2014). Accordingly, plaintiffs' motion to remand is denied.

### III. Motion to Dismiss of defendants Tulsa Cement LLC, Eagle Materials, Inc., and Jake Medrano [Doc. 20]

The court next considers the Motion to Dismiss of defendants Tulsa Cement, Eagle Materials, and Medrano. As previously stated, plaintiffs assert four claims: (I) unlawful termination/retaliation; (II) breach of contract for violation of the "Eagle Ethics" policy; (III) intentional infliction of emotional distress; and (IV) breach of the Collective Bargaining Agreement. Defendants seek dismissal of all of plaintiffs' claims.

#### A. *Motion to Dismiss Standard*

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a claim that "fail[s] to state a claim upon which relief can be granted." "To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations 'to state a claim to relief that is plausible on its face.'" *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104 (10th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is

facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' are insufficient." *Estate of Lockett ex rel. Lockett v. Fallin*, 841 F.3d 1098, 1107 (10th Cir. 2016) (quoting *Twombly,* 550 U.S. at 555). "Dismissal is appropriate if the law simply affords no relief." *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc*., 680 F.3d 1194, 1202 (10th Cir. 2011). When considering a Rule 12(b)(6) motion to dismiss, the court may consider "not only the complaint, but also the attached exhibits and documents incorporated into the complaint by reference." *Id.* at 1201.

Consideration of the exhibits to the petition does not require the court to convert the motion to dismiss to a motion for summary judgment. *See Pace v. Swerdlow,* 519 F.3d 1067, 1072 (10th Cir. 2008).

B.     *Count I – Unlawful Termination/Retaliation*

Defendants argue that plaintiffs' unlawful termination/retaliation claim falls within the exclusive jurisdiction of the National Labor Relations Board and is therefore precluded under the doctrine articulated by the Supreme Court in *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236 (1959).[6] [Doc. 20, pp. 14-15].

Pursuant to the *Garmon* doctrine, "both state and federal courts generally lack original jurisdiction to determine disputes involving conduct actually or arguably prohibited or protected

---

[6] "The Tenth Circuit has not explicitly considered whether *Garmon* pre-emption should be dismissed under 12(b)(1) or 12(b)(6)." *Butcher v. Teamsters Local 955*, No. 18-CV-02424-JAR-KGG, 2018 WL 6200027, at *2 (D. Kan. Nov. 28, 2018). Nor does defendants' motion clearly point to either Fed. R. Civ. P. 12(b)(1) or Fed. R. Civ. P. 12(b)(6). In a well-reasoned opinion, U.S. District Judge Robinson of the District of Kansas considered *Garmon* pre-emption pursuant to Fed. R. Civ. P. 12(b)(6). *Id.* at *3. The court agrees with Judge Robinson's analysis in *Butcher* and will consider defendants' argument for *Garmon* pre-emption under Fed. R. Civ. P. 12(b)(6).

by the [National Labor Relations Act]." *United Ass'n of Journeyman & Apprentices of the Plumbing & Pipe Fitting Indus., Local No. 57 v. Bechtel Power Corp.*, 834 F.2d 884, 886 (10th Cir. 1987). This is because, through the NLRA,

> Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes towards labor controversies. *** A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law.

*Garmon*, 359 U.S. at 242-43 (quoting *Garner v. Teamsters, Chauffeurs & Helpers Local Union No. 776*, 346 U.S. 485, 490 (1953)). Thus, when it is clear that a particular activity is protected by section 7 of the NLRA or constitutes an unfair labor practice under section 8, both state and federal courts must defer to the exclusive jurisdiction of the National Labor Relations Board. *Id.* at 243-45. Further, claims involving conduct that is "arguably" protected or prohibited may be excluded from the court's jurisdiction under *Garmon*. *Int'l Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 392-95 (1986). However, "where the activity regulated was a merely peripheral concern of the Labor Management Relations Act" or "where the regulated conduct touched interests so deeply rooted in local feeling and responsibility," *Garmon* pre-emption does not apply. *Id.* at 392 (quoting *Garmon*, 359 U.S. at 243-44).

The Petition alleges that Tulsa Cement terminated plaintiffs shortly after plaintiffs filed formal complaints against it with the NLRB, [Doc. 2-1, p. 14, ¶¶ 70 and 73-74; Doc. 2-4, p. 9] and cites section 8(a)(4) of the NLRA. [Doc. 2-1, p. 14, ¶ 70]. Section 8(a)(4) of the NLRA defines an "unfair labor practice" to include "discharg[ing] or otherwise discriminat[ing] against an

employee because he has filed charges or given testimony under this subchapter." 29 U.S.C. § 158(a)(4). The subsection reflects congressional intent to implement the NLRA through the initiative of individual persons filing unfair labor practice charges and to protect those persons from coercion or restraint against filing by their employers. *See Nash v. Fla. Indus. Comm'n*, 389 U.S. 235, 238 (1967). Accordingly, allegations that plaintiffs filed formal complaints with the NLRB clearly constitute protected activity under section 8 of NLRA, and *Garmon* applies.

Additionally, plaintiffs allege they engaged in protected activity by filing grievances against Tulsa Cement with the Union, and, specific to Elliott, serving as a union officer, which led to additional harassment. [Doc. 2-1, pp. 9 and 14-15, ¶¶ 32-33, 70, 72, and 74]. Section 8(a)(3) of the NLRA prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization[.]" 29 U.S.C. § 158(a)(3). Claims for retaliation due to protected union activity therefore constitute violations of the NLRA, and the *Garmon* doctrine applies to vest exclusive jurisdiction with the NLRB.[7] *See Cumpston,* 76 F. App'x at 865 ("Accordingly, to the extent plaintiff's pleadings assert a claim for anti-union retaliation, we hold the claim barred by *Garmon* preemption[.]"); *Bullard v. Goodyear Tire & Rubber Co.*, No. 09-4024-SAC, 2011 WL 4092192, at *20 (D. Kan. Sept. 14, 2011) ("Based on allegations of anti-union retaliation amounting to a violation of the NLRA, the plaintiff's claim is thereby barred by *Garmon* preemption[.]").

In response to the motion to dismiss, plaintiffs argue the exceptions to *Garmon* pre-emption apply. [Doc. 38, pp. 4-5]. As previously stated, *Garmon* pre-emption does not apply "where the

---

[7] In fact, charge no. 14-CA-203404 filed with the NLRB, attached as exhibit 12 to the Petition, asserts that Tulsa Cement disciplined Elliott "to discourage union activities or membership." [Doc. 2-4, p. 9]. *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes.").

activity regulated was a merely peripheral concern of the Labor Management Relations Act" or "where the regulated conduct touched interests so deeply rooted in local feeling and responsibility." *Garmon*, 359 U.S. at 243-44. However, as discussed above, plaintiff's Petition asserts a claim for retaliation based upon plaintiffs' protected union and NLRB activity. Such conduct lies at the heart of the NLRA and cannot be characterized as "merely peripheral." *Cf. Peabody Galion v. A.V. Dollar*, 666 F.2d 1309, 1317 (10th Cir. 1981) (applying exception to claim for retaliation based on filing of workers' compensation claim, reasoning "[a] congressional intent to deprive the states of their power to enforce such general laws is more difficult to infer than an intent to pre-empt laws which are directed specifically at concerted union activity"). Further, the court's adjudication would directly conflict with federal labor law. Thus, although the claim may touch on local interests, the NLRB retains jurisdiction and the claim is pre-empted. *See Conner v. Boeing Co.*, No. 05-1331-JTM, 2006 WL 1487007, at *3 (D. Kan. May 26, 2006).

Because the alleged protected activity at issue in the Petition clearly constitutes protected activity under section 8 of the NLRA, pursuant to the principles articulated in *Garmon*, the claim is pre-empted. Defendants' motion to dismiss count I – unlawful termination/retaliation is therefore granted, and plaintiffs' count I wrongful termination/retaliation claim is dismissed.[8]

C.    *Count II – Breach of Contract*

As previously stated, the Petition assets a claim for breach of contract premised on defendants' alleged violation of the "Eagle Ethics" policies prohibiting harassment. [Doc. 2-1, pp. 16-17, ¶¶ 77-80]. Defendants seek dismissal of the contract claim based on LMRA pre-emption.[9]

_____

[8] Because the court concludes that the claim is pre-empted pursuant to the *Garmon* doctrine, the court does not consider defendants' arguments that plaintiffs' wrongful termination/retaliation claim is time-barred or subject to LMRA pre-emption.

[9] In a footnote, defendants also ask the court to dismiss Eagle Materials as an improper party. [Doc. 20, p. 17 n. 6]. Defendants argue plaintiffs do not include sufficient facts to establish joint

With regard to state law claims, the Supreme Court has stated "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort" and therefore LMRA pre-emption applies. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985). However, "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301," *id.*, and § 301 does not pre-empt claims independent of a labor contract. *Id.* at 211-12. To determine whether a state law claim is pre-empted, the court must consider whether liability is "inextricably intertwined with consideration of the terms of the" collective bargaining agreement. *Id.* at 213; *see also Williams,* 482 U.S. at 396 ("[A] plaintiff covered by a collective-bargaining agreement is permitted to assert legal rights *independent* of that agreement, including state-law contract rights, so long as the contract relied upon is *not* a collective-bargaining agreement.") (emphasis in original).

---

employer liability and cite to United States District Judge DeGiusti's decision in *Mitchem v. Edmond Transit Mgmt., Inc*., No. CIV-10-1203-D, 2012 WL 2370669, at **4-5 (W.D. Okla. June 22, 2012). In *Mitchem*, plaintiff asserted federal and state employment retaliation claims against several distinct entities. The court applied the "joint-employer test" articulated by the Tenth Circuit in *Bristol v. Bd. of Cnty. Comm'rs*, 312 F.3d 1213, 1218 (10th Cir. 2002), which requires consideration of whether "both entities exercise significant control over the same employees." *Mitchem*, 2012 WL 2370669, at *3 (quoting *Bristol*, 312 F.3d at 1218).

Here, however, plaintiffs allege Eagle Materials is the parent corporation of Tulsa Cement. [Doc. 2-1, p. 3, ¶ 5]. In the context parent-subsidiary relationships, the Tenth Circuit has applied "four different tests to determine whether a parent corporation is liable for the acts of its subsidiary": (1) agency theory, (2) alter ego theory, (3) instrumentality test, and (4) integrated enterprise test. *Frank v. U.S. West, Inc*., 3 F.3d 1357, 1362 (10th Cir. 1993). Application of the four tests is dependent upon the facts of the case. *Id.* Defendants' motion to dismiss includes no argument directed to these four tests. Nor do plaintiffs identify the theory pursuant to which they seek to hold Eagle Materials liable. In light of the fact-dependent nature of the inquiry, and absent argument of the parties directed to the issue, the court declines to determine the applicable test to determine Eagle Materials' potential liability at this stage of the litigation.

Plaintiffs rely on internal employer policies included in the *"Eagle Ethics" – A Guide to Decision-Making on Business Conduct Issues* [Doc. 2-1, pp. 16-17, ¶¶ 77-80; Doc. 2-2, pp. 9-13], and argue the Eagle Ethics policy is not "inextricably intertwined" with the CBA. Plaintiffs attached both the CBA and Eagle Ethics policy as exhibits to their Petition and therefore the court may consider both documents without converting defendants' motion to dismiss to a motion for summary judgment. *See Pace,* 519 F.3d at 1072; Fed. R. Civ. P. 10(c). Accordingly, the court will consider whether the *Eagle Ethics* policy is "inextricably intertwined" with the CBA.

Following review of the *Eagle Ethics* policy and CBA, the court is persuaded that this matter is factually analogous to the Tenth Circuit's decisions in *Garley* and *Cumpston*. In *Garley*, the Tenth Circuit considered a breach of implied contract claim based on plaintiff's employer's personnel policy, code of ethics and director's memo, concluding that the policies "were intended to be read in harmony with the [collective bargaining agreement]." *Garley*, 236 F.3d at 1210. The court reasoned that the policies both explicitly and implicitly referred to the collective bargaining agreement and therefore the documents upon which plaintiff relied were "inextricably intertwined with consideration of the terms of the labor contract." *Id.* at 1211 (quoting *Allis-Chalmers*, 471 U.S. at 213).

In *Cumpston*, plaintiff asserted an implied contract claim based on his employer's business ethics standards, which forbid "harassment of any nature," but did not explicitly reference the collective bargaining agreement. *Cumpston,* 76 F. App'x at 863. The court nevertheless concluded that a determination of liability required consideration of the collective bargaining agreement for two separate reasons. *Id.* at 864.

> Because the prohibition on "harassment" set out in the standards is devoid of descriptive content, and the actions plaintiff complains of are not on their face so inherently or plainly wrongful as to make application of such a label ineluctable,

> there would be no way of telling whether the standards were violated here without consulting the CBA to assess the opposing rights and privileges of the parties.

*Id.* Specifically, the relevant prohibition against harassment only referred to "conduct that interferes with work related responsibility and legal requirements for the protection of all employees" and therefore required reference to the collective bargaining agreement to clarify "work related responsibilities." *Id.* at 864 n.3. Thus, the employer's business ethics policies were "inextricably intertwined" with the terms of the collective bargaining agreement, and the LMRA pre-empted plaintiff's implied contract claim. *Id.*

Here, the "Eagle Ethics" policy implicitly references the CBA, as the policy requires employees to "[r]ead and understand 'Eagle Ethics' (as well as any business conduct policies specific to our business units)" and states: "Your company may also have its own more narrowly-defined policies on conduct in the workplace. If so, you must comply with both the policy set out here and your company policy." [Doc. 2-2, pp. 10 and 12]. Further, the CBA empowers Tulsa Cement to issue and revise company policies. [Doc. 20-1, p. 8]. Finally, both the *Eagle Ethics* policy and CBA prohibit harassment and discrimination on the basis of age, color, race, religion, disability, sex, or national origin. [Doc. 2-2, p. 11 and Doc. 20-1, p. 8].[10] Thus, the court is persuaded that the documents were "intended to be read in harmony." *See Garley*, 236 F.3d at 1210; *see also Carroll*, 749 F. Supp. 2d at 1231 (finding that personnel rules and regulations and procedures manual were "interdependent on the [collective bargaining agreement]") (citing *Henderson v. Merck & Co.*, 998 F. Supp. 532, 538 (E.D. Pa. 1998) ("Any contract [allegedly]

---

[10] The court refers to the Collective Bargaining Agreement attached to defendants' motion to dismiss, rather than that attached as an exhibit to the Petition which was incomplete. However, because the CBA is incorporated by reference into plaintiffs' Petition, central to plaintiffs' claims, and plaintiffs' response does not dispute the authenticity of the CBA attached to defendants' motion to dismiss, the court may consider the Collective Bargaining Agreement as attached to defendants' motion to dismiss without converting the motion to one for summary judgment. *See Dean Witter Reynolds, Inc. v. Howsam,* 261 F.3d 956, 961 (10th Cir. 2001).

formed by the employment manual would be concurrent with a collective bargaining agreement.")); *Steinbach v. Dillon Cos., Inc*., 253 F.3d 538, 543 (10th Cir. 2001) ("It is the collective bargaining agreement that authorized the employer to develop these policies, however, and it is the agreement which defines the scope of the employer's authority."); *Washington v. AlliedBarton Sec. Servs., LLC*, 217 F. Supp. 3d 208, 214 (D.D.C. 2016) (noting collective bargaining agreement granted employer the right to promulgate policies, and concluding "to the extent that these policies existed, were distinct from the CBA, and contained relevant content beyond what is in the CBA, they nonetheless would have been promulgated pursuant to the CBA, and would not be sufficiently independent of that document to allow Plaintiff to avoid preemption") (internal citation omitted).

Even if the "Eagle Ethics" policy did not implicitly reference the CBA, a determination of plaintiffs' claim requires consideration of the CBA. The "Eagle Ethics" policy tasks each employee to "do his/her part to maintain a safe and healthy work environment free of discrimination, harassment, and violence" and defines "harassment" to include "verbal or physical abuse, unwelcome contact, advances or propositions, displays of offensive materials or other acts which create a hostile work environment." [Doc. 2-2, p. 11]. Plaintiffs allege defendants violated the policy through repeated incidents of harassment, threats, and intimidation. [Doc. 2-1, p. 3, ¶ 8]. Specific incidents include the following: Brown demanded Elliott perform mathematical calculations outside the scope of his job [Doc. 2-1, p. 3, ¶ 8]; Brown screaming "where's that motherf****r?" referring to Elliott [Doc. 2-1, p. 6, ¶ 19]; Keller cursing plaintiffs for arriving for work too early [Doc. 2-1, p. 9, ¶ 33]; telling graphic, sexual stories in Elliott's presence [Doc. 2-1, p. 10, ¶ 38]; and instructing Elliott to throw a smoke bomb at another employee [Doc. 2-1, p. 10, ¶ 39]. Plaintiffs allege both Brown and Keller are supervisors. [Doc. 2-1, p. 3, ¶¶ 8-9]. The

CBA explicitly defines management rights, and states "[Tulsa Cement] shall have the exclusive right to manage the business and to direct the working forces." [Doc. 20-1, pp. 7]. As in *Cumpston*, the policy's generic references to "doing his part" and "maintain[ing] a safe and healthy work environment" free from harassment will necessarily require consideration of the CBA's provisions and the rights and duties of the parties thereunder. *See Cumpston,* 76 F. App'x at 864. Accordingly, the "Eagle Ethics" policy is "inextricably intertwined" with the CBA, and section 301 of the LMRA pre-empts plaintiffs' breach of contract claim.[11]

### D. Count III – Intentional Infliction of Emotional Distress

Under Oklahoma law, an intentional infliction of emotional distress (IIED) claim, also known as the tort of outrage, "lie[s] only where there is extreme and outrageous conduct coupled with severe emotional distress." *Brock v. Thompson,* 948 P.2d 279, 294 (Okla. 1997). Defendants seek dismissal of plaintiffs' intentional infliction of emotional distress claim for two reasons. First, because the claim is pre-empted by the LMRA and, second, because plaintiffs cannot establish a prima facie claim.[12] Because the court concludes that plaintiffs' intentional infliction of emotional distress claim is pre-empted by § 301 of the LMRA, the court does not consider whether the allegations of plaintiffs' Petition state a prima facie IIED claim. *See Johnson v. Beatrice Foods Co.*, 921 F.2d 1015, 1022 (10th Cir. 1990).

---

[11] For the same reason, to the extent that plaintiffs premise their intentional infliction of emotional distress claim on breaches of the "Eagle Ethics" policy, the claim is pre-empted. *See* [Doc. 2-1, p. 18, ¶ 81 ("Defendants Kristopher Todd Brown, Jake Medrano and Tommy Keller acted outside the scope of their employment as described in the *Eagle Ethics Conduct In the Workplace* policy when management harassed, threatened and intimidated employees.").

[12] Plaintiffs' response characterizes defendants' motion to dismiss theory as pre-emption under the *Garmon* doctrine, and cites the Tenth Circuit's discussion of the exceptions to *Garmon* pre-emption in *Peabody*. [Doc. 38, p. 9]. However, defendants' motion does not seek dismissal of the intentional infliction of emotional distress claim under *Garmon* and therefore *Peabody* is not persuasive.

The Tenth Circuit has regularly held that intentional infliction of emotional distress claims are pre-empted by § 301. *Johnson*, 921 F.2d at 1020; *Rael v. Smith's Food & Drug Ctrs., Inc.*, 712 F. App'x 802, 805 (10th Cir. 2017) ("Our subsequent decisions have largely followed *Johnson* in holding that IIED claims are preempted by § 301."). This includes claims against individual supervisors. *See Steinbach*, 253 F.3d at 539.

In *Johnson*, plaintiff asserted an intentional infliction of emotional distress claim under Oklahoma law against his supervisor. *Id.* at 1017. Plaintiff alleged his supervisor "instituted a campaign of intentional discrimination and harassment" against him, and pointed to twenty-eight (28) specific incidents, including: the supervisor yelling and verbally abusing plaintiff while pounding the desk, beating the walls, and stomping on the floor; frequently calling plaintiff names in front of co-workers; encouraging co-workers to shun plaintiff; and publicly ridiculing plaintiff. *Id.* The Tenth Circuit concluded the claim was pre-empted, reasoning "[e]ach of [plaintiff's] allegations directly relates to either explicit or implied rights derived from the CBA" and, "[f]urthermore, [plaintiff] could have used the CBA grievance procedure for any of the allegations in his complaint since all the allegations involved either a suspension, discharge or work-related dispute." *Id.* at 1020. Further, the court noted that "Oklahoma has held that a claim for intentional infliction of emotional distress 'should not be considered in a sterile setting, detached from the milieu in which it took place,'" and interpreted that to mean "all aspects of [plaintiff's] employment, including the terms of the CBA, must be considered when evaluating whether [the supervisor's] conduct was outrageous." *Id.* (quoting *Eddy v. Brown*, 715 P.2d 74, 77 (Okla. 1986)).

In a more recent unpublished decision, the Tenth Circuit applied *Johnson* to pre-empt an IIED claim premised on similar allegations. *See Rael*, 712 F. App'x at 806-07. In that case, allegations plaintiff's supervisor "yelled at and 'constantly harassed, belittled, and degraded'

[plaintiff]," required interpretation of the CBA to determine whether the supervisor's alleged conduct was outrageous. *Id.* at 803-07. *See also Mowry v. United Parcel Serv.*, 415 F.3d 1149, 1158 (10th Cir. 2005) (pre-empting IIED claim because determining whether supervisor's conduct was outrageous "require[d] construction of [employer's] rights and obligations under the CBA, 'as that is the reference point against which [employer's] action must be scrutinized'") (quoting *Garley*, 236 F.3d at 1214).

The court concludes the allegations of plaintiffs' Petition are analogous to those in *Johnson*, *Mowry*, and *Rael*, and, therefore, binding Tenth Circuit precedent requires pre-emption of plaintiffs' intentional infliction of emotional distress claim. Like the plaintiff in *Johnson*, plaintiffs cite specific instances in which supervisors allegedly yelled at them and used expletives to refer to plaintiffs in front of other employees. [Doc. 2-1, p. 18, ¶¶ 81-84]. Additionally, as in *Rael*, the Petition includes general allegations that plaintiffs felt harassed and threatened. [*Id.*]. Because, as previously discussed, the CBA prohibits harassment and defines management's rights, determining whether the conduct is outrageous will require construction of the employer's rights and obligations under the CBA. *Mowry*, 415 F.3d at 1158. Further, because plaintiffs' allegations relate to work-related disputes, plaintiffs could have used—and in fact allege that in some instances they did—use the grievance procedure included in the CBA.[13] *See Galway v. Smith's Food & Drug Ctr., Inc.*, 72 F.3d 137, at *2 (10th Cir. 1995) (unpublished table decision). Thus, the Tenth Circuit's decision in *Johnson* is not distinguishable, and the intentional infliction of emotional distress claim is pre-empted.[14]

---

[13] Plaintiffs allege Elliott filed a grievance against Brown regarding his harassment on August 15, 2015 [Doc. 2-1, p. 4, ¶ 11], and that they reported a June 22, 2017 incident to Union leadership and set up a meeting with Tulsa Cement management to discuss. [*Id.* pp. 9-10, ¶ 34].

[14] Although not cited in plaintiffs' response to the motion to dismiss, the Tenth Circuit cases holding that IIED claims are not pre-empted are distinguishable. *See Garley*, 236 F.3d at 1214

*E.*      *Count IV – Breach of the Collective Bargaining Agreement*

Defendants seek dismissal of plaintiffs' breach of Collective Bargaining Agreement claim, but divide the alleged breaches into two general categories: (1) breach with respect to grievances related to plaintiffs' termination and (2) other miscellaneous breaches of the CBA during plaintiffs' employment with Tulsa Cement. The court will first consider the alleged breach with respect to grievances related to plaintiffs' termination.

1.      <u>Termination Allegations</u>

Defendants argue plaintiffs' allegations that the Union breached its duty with respect to their termination grievances are pre-empted because plaintiffs failed to exhaust their administrative remedies. In response, plaintiffs point to allegations the Union breached its duty of fair representation and argue exhaustion of administrative remedies requirement is excused.

Although an employee is generally required to exhaust any grievance or arbitration procedures included in the collective bargaining agreement before bringing a civil lawsuit, the Supreme Court recognized

> this rule works an unacceptable injustice when the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation. In such an instance, an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding.

---

(IIED claim based on conduct after an arbitrator ordered plaintiff's reinstatement); *Albertson's, Inc. v. Carrigan*, 982 F.2d 1478 (10th Cir. 1993) (IIED claim based on allegations that defendants conspired to have plaintiff arrested by fabricating theft from employer). Plaintiffs' claim includes no allegations of retaliatory harassment after the completion of binding arbitration as in *Garley*, nor is the alleged misconduct sufficiently analogous to that alleged in *Albertson's, Inc.* such that the court would not need to look to the CBA to determine the outrageousness of the misconduct.

*DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983).[15]  Thus, the Tenth Circuit interprets the duty of fair representation standard as "prohibiting arbitrary, discriminatory, bad faith, or perfunctory conduct." *Webb v. ABF Freight Sys., Inc*., 155 F.3d 1230, 1239 (10th Cir. 1998).  Mere negligent conduct, carelessness, or honest mistakes are insufficient. *Id.* at 1240.

Plaintiffs allege the Union "deliberately and arbitrarily ignored Plaintiffs' grievances." [Doc. 2-2, p. 1, ¶ 97].  Plaintiffs allege Clay Herford, who was sent by the Union to negotiate on behalf of the Local Union and employees, "did not press the grievances to [Tulsa Cement] to move to the next step, per CBA" [*Id.* p. 2, ¶ 97], and failed to attend meetings with Local Union representatives to discuss the grievances.  [*Id.* p. 3, ¶ 99].  Additionally, plaintiffs allege Herford colluded with Tulsa Cement, citing meetings between Herford and Tulsa Cement executive Alan Gee that Local Union representatives were not privy to.  [*Id.*]  Plaintiffs allege local union representatives were not informed of the results of those meetings.  [*Id.*].

However, the Petition includes statements that plaintiffs *requested* the grievances be dropped.  [Doc. 2-1, p. 14, ¶ 64].  Although not binding precedent, the court is persuaded by the Tenth Circuit's analysis in *Ortega*.  In that case, the court upheld a district court's dismissal under Rule 12(b)(6) of a hybrid claim for failure to exhaust administrative remedies.  *Id*. at 780.  Plaintiff in that case filed a civil lawsuit asserting a hybrid claim days prior to the scheduled mediation

---

[15] The Court went on to explain the nature of a hybrid section 301 claim, stating: "Such a suit, as a formal matter, comprises two causes of action.  The suit against the employer rests on § 301, since the employee is alleging a breach of the collective bargaining agreement.  The suit against the union is one for breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act.  Yet the two claims are inextricably interdependent.  To prevail against either the company or the Union . . . [employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union.  The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both. The suit is thus not a straightforward breach of contract suit under § 301 . . . but a hybrid § 301/fair representation claim . . . ." *DelCostello*, 462 U.S. at 164-65 (internal citations omitted).

under the collective bargaining agreement based on her dissatisfaction with the union's representation and the union's threats to drop the grievance. *Id*. at 776-77. The court cited the requirement that, to constitute a breach of the duty of fair representation, "the breach must seriously undermine the integrity of the grievance process," and reasoned,

> [plaintiff] cannot complain that the Union "seriously undermined" the uncompleted mediation or some future arbitration, as the results are not yet known. Her fears about how the Union *might* act (or not act) during the grievance proceeding are insufficient to proceed with a hybrid suit based on a DFR claim against the Union at this time.

*Id*. (emphasis in original).

Here, although plaintiff alleges "Local Union leaders advised Plaintiffs that after conversations with International Union representative Herford, they believed the International Union would not pursue the grievance" [Doc. 2-1, p. 13, ¶ 63], based on the allegations of the Petition, the court can reasonably infer only that the Union made the final decision not to pursue plaintiffs' grievances *only after* plaintiffs requested the grievances be dropped. "[Plaintiffs'] fears about how the Union might act (or not act)" are insufficient to state a claim against the Union. *Ortega,* 643 F. App'x at 780. Because the factual allegations of the Petition indicate plaintiffs— not the Union—ultimately abandoned the grievance process, the court is unable to reasonably infer that *the Union* seriously undermined the grievance process and plaintiffs fail to state a plausible hybrid claim premised on breach of the duty of fair representation.[16] Because plaintiffs failed to exhaust their administrative remedies as to their termination grievances, plaintiffs' hybrid claim must be dismissed to the extent premised on plaintiffs' termination grievances.

---

[16] For this reason, amendment of the Petition regarding the termination grievances would be futile.

2.    Miscellaneous Breaches of CBA Provisions

Defendants next seek dismissal of plaintiffs' breach of collective bargaining act claim premised on miscellaneous breaches of the CBA, primarily arguing plaintiffs failed to exhaust administrative remedies.[17]  *See* [Doc. 20, pp. 29-30; Doc. 43, pp. 8-10].

As previously stated, ordinarily, an aggrieved employee must fully exhaust the exclusive remedies provided by the collective bargaining agreement prior to bringing a civil lawsuit.  *Vaca v. Sipes*, 386 U.S. 171, 184 (1967); *see also Garvin v. Am. Tel. & Tel. Co.*, 174 F.3d 1087, 1093 (10th Cir. 1999) ("It is well established that 'an employee can only sue [under § 301 of the LMRA] if he or she has exhausted any exclusive grievance procedures provided in the collective bargaining agreement.'") (quoting *United Food & Commercial Workers, Local Union No. 7R v. Safeway Stores, Inc.*, 889 F.2d 940, 944 (10th Cir. 1989)).  However, exhaustion may be excused when "(1) it would be futile; (2) the employer through its conduct has repudiated the grievance procedure itself; or (3) the union has prevented the employee from utilizing the grievance process by breaching its duty of fair representation."  *Garvin,* 174 F.3d at 1093.

The Petition includes no allegations from which the court may reasonably infer that plaintiffs proceeded to arbitration on any grievances filed with respect to Tulsa Cement's alleged CBA breaches.[18]  Rather, the court can reasonably infer only that the grievances were *not*

---

[17] In response, plaintiffs argue that the *Garmon* doctrine is inapplicable.  Defendants do not seek dismissal of plaintiffs' § 301 hybrid claim based on *Garmon* pre-emption.  However, plaintiffs are correct that "*Garmon* and like cases have no application to § 301 suits." *Vaca*, 386 U.S. at 184. For this reason, the court is also not persuaded by defendants' argument that the NLRB retains jurisdiction.  *See Hammontree v. N.L.R.B.,* 925 F.2d 1486, 1494 (D.C. Cir. 1991) ("[Plaintiff] cannot nullify his contractual claim simply by choosing to pursue his statutory claim.").

[18] The Supreme Court has recognized that "[i]f a grievance and arbitration procedure is included in the contract, but the parties do not intend it to be an exclusive remedy, then a suit for breach of contract will normally be heard even though such procedures have not been exhausted." *Vaca*, 386 U.S. at 184 n.9 (citing *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 657-58 (1965)). Plaintiffs do not argue that the parties to the CBA did not intend for Article 15 – Grievances and

arbitrated. *See* [Doc. 2-1, pp. 5 and 20, 25, ¶¶ 15, 87, 91, and 95 (allegations grievances were not moved to next step); *see also* Doc. 2-1, p. 13, ¶ 60 (allegation NLRB issued <u>pre-arbitration</u> *Collyer* deferral letters)]. Thus, the court must consider whether plaintiffs pled sufficient facts to allow a reasonable inference that the failure to exhaust administrative remedies is excused for any one of the three exceptions identified above. *See Garvin,* 174 F.3d at 1093.

Plaintiffs primarily rely on breach of the duty of fair representation. Upon review, the Petition satisfies the factual specificity required to state a claim for breach of the duty of fair representation premised on miscellaneous breaches of the Collective Bargaining Agreement. As previously stated, "[a] duty-of-fair-representation claim arises when a union that represents an employee in a grievance or arbitration procedure acts in a 'discriminatory, dishonest, arbitrary or perfunctory' fashion." *Webb*, 155 F.3d at 1239 (quoting *Int'l Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 864 n.6 (1987)); *see also Schwartz v. Bhd. of Maintenance of Way Emp'es*, 264 F.3d 1181, 1185 (10th Cir. 2001) (a union is liable for conduct that is "arbitrary, discriminatory, or in bad faith") (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)).

Plaintiffs assert the Union acted in bad faith or dishonestly, "colluded" with Tulsa Cement, and refused to arbitrate grievances against Tulsa Cement. [Doc. 2-1, p. 4, ¶ 12; Doc. 2-2, pp. 2-3, ¶ 99]. "Bad faith requires a showing of fraud, or deceitful or dishonest action." *Considine v. Newspaper Agency Corp.*, 43 F.3d 1349, 1357 (10th Cir. 1994) (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)). Plaintiffs allege, as early as December 1, 2015, Union

---

Arbitration to be the exclusive remedy for work-related grievances and, in fact, concede the exclusivity of remedy in the Petition. *See* [Doc. No. 2-1, p. 25, ¶ 95]. Further, interpreting the CBA as a whole, the court concludes Article 15 – Grievances and Arbitration provides an aggrieved employee's exclusive remedy. *See* [Doc. 20-1, p. 23, § 15.01 ("The parties *will* agree to discuss any problem concerning this collective agreement that may arise at work in the following manner[.]) (emphasis added) and § 15.01 – Step Four ("The decision of the arbitrator will be final and binding upon both parties."). Finally, the court must apply a presumption of arbitrability. *See AT&T Techs., Inc. v. Comm'cns Workers of Am.*, 475 U.S. 643, 650 (1986).

representative Herford "told Local Union members he would get Local Union jobs back, but told the Local Union committee he would not arbitrate the grievances against [Tulsa Cement]." [Doc. 2-1, p. 4, ¶ 12]. Additionally, plaintiffs allege Herford failed to attend a scheduled meeting with Local Union members to discuss grievances. [*Id.* ¶ 13]. Further, Herford allegedly "met in private meetings with [Tulsa Cement] executive Alan Gee, Local Union representatives were not privy to the meetings, nor were told the result of the meeting. Herford then refused to process the grievances, nor would take the grievances to arbitration." [Doc. 2-2, pp. 2-3, ¶ 99]. Plaintiffs allege that Herford traded Union jobs for plaintiffs' grievances, and the Union "provided no further assistance to improve the work environment at [Tulsa Cement]." [Doc. 2-1, p. 5, ¶ 15; Doc. 2-2, pp. 2-3, ¶¶ 97 and 99]. Plaintiffs' allegations of missed meetings with Local Union members, closed door meetings, and trading for Union jobs nudge plaintiffs' claim of breach of the duty of fair representation "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Thus, plaintiffs have sufficiently alleged an exception to the administrative exhaustion requirement, and plaintiffs' breach of Collective Bargaining Agreement claim premised on miscellaneous breaches will not be dismissed.[19]

---

[19] Defendants also argue plaintiffs failed to exhaust administrative remedies included in the Union's Constitution and Bylaws. [Doc. 20, pp. 30-31]. Unlike administrative remedies included in collective bargaining agreements, the Supreme Court has recognized "courts have discretion to decide whether to require exhaustion of internal union procedures." *Canady v. UAW Local 31*, 368 F. Supp. 2d 1143, 1150 (D. Kan. 2004) (citing *Clayton v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 451 U.S. 679 (1981)). To determine whether to require exhaustion, the court should consider three factors: (1) whether the employee may obtain a fair hearing in the face of union hostility; (2) whether internal union appeals procedures "would be inadequate either to reactivate the employee's grievance or to award [them] full relief"; and (3) the potential delay to a judicial hearing on the merits of the employees' claim. *Id.* The briefing includes no argument directed to the three factors. Further, the parties did not provide the court a complete copy of the Union Constitution and Bylaws. For these reasons, the court does not consider whether exhaustion of internal union procedures is required.

For the reasons discussed above, pursuant to Fed. R. Civ. P. 12(b)(6), plaintiffs' Petition fails to state a plausible claim for relief for unlawful termination/retaliation, breach of contract, intentional infliction of emotional distress, and breach of Collective Bargaining Agreement premised on plaintiffs' termination. However, the Petition states a plausible claim for breach of the Collective Bargaining Agreement premised on miscellaneous breaches of the CBA. Thus, the motion to dismiss of defendants' Tulsa Cement, Eagle Materials, and Jake Medrano must be granted in part and denied in part.

## IV. Motion to Dismiss of defendants Kristopher Todd Brown and Tommy Keller [Doc. 23]

Brown and Keller argue the Petition asserts only one claim against them—intentional infliction of emotional distress—and seek dismissal of that claim based on preemption, statute of limitations, and failure to satisfy the pleading requirements of Fed. R. Civ. P. 12(b)(6). In opposition, plaintiffs "respectfully disagree that Defendants Brown and Keller are only included in the third claim listed for intentional infliction of emotional distress" and assert Brown and Keller are liable for wrongful termination/retaliation, breach of contract, and intentional infliction of emotional distress, and "ancillary" to the cause of action for breach of the collective bargaining agreement. Thus, the court will consider each claim.

First, as to wrongful termination/retaliation, for the reasons discussed above with respect to the motion to dismiss of defendants Tulsa Cement, Eagle Materials, and Medrano [Doc. 20], the claim is properly dismissed pursuant to the *Garmon* doctrine.

Second, as to breach of contract, the Petition includes no allegations from which the court may reasonably infer that a contract existed between Brown and Keller and plaintiffs. *Cates v. Integris Health, Inc.*, 412 P.3d 98, 103 (Okla. 2018) (elements of a breach of contract claim are: "(1) the formation of a contract, (2) breach of the contract, and (3) damages as a result of that

breach"). Further, the Eagle Ethics policy cited by plaintiffs is "inextricably intertwined" with the CBA, and section 301 of the LMRA pre-empts plaintiffs' breach of contract claim

Third, as previously stated, the Tenth Circuit has regularly held that intentional infliction of emotional distress claims are pre-empted by § 301, including claims against individual supervisors. *Johnson*, 921 F.2d at 1016; *Steinbach*, 253 F.3d at 539. For the same reasons discussed above with respect to Doc. 20, the court concludes plaintiffs' intentional infliction of emotional distress claim is pre-empted.

Fourth, plaintiffs identify no legal authority for the proposition that an individual may be liable for breach of a collective bargaining agreement under § 301 and, in fact, implicitly concede that Brown and Keller are only "ancillary" to the claim. Thus, the Petition fails to state a plausible hybrid claim against Brown and Keller.[20]

Because plaintiffs fail to state a plausible claim under any theory against the individual defendants, Brown and Keller's motion to dismiss is granted.

## V. Claims against the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers

The Union did not move to dismiss plaintiffs' claims against it. However, it is well-established "a court may dismiss *sua sponte* 'when it is 'patently obvious' that the plaintiff could not prevail on the facts alleged, and allowing him an opportunity to amend his complaint would be futile." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (quoting *McKinney v. Oklahoma*, 925 F.2d 363, 365 (10th Cir. 1991)). Here, plaintiffs' wrongful termination/retaliation claim is pre-empted pursuant to the *Garmon* doctrine, and the breach of contract and intentional infliction of emotional distress claims are pre-empted by § 301. Additionally, plaintiffs' breach of Collective Bargaining Agreement claim, to the extent premised on plaintiffs' termination, is pre-empted for

---

[20] For this same reason, the Petition fails to state a plausible hybrid claim against Medrano.

failure to exhaust administrative remedies.  Thus, plaintiffs cannot prevail on the facts alleged, and any opportunity to amend would be futile.  Accordingly, the court *sua sponte* dismisses plaintiffs' wrongful termination/retaliation, breach of contract, intentional infliction of emotional distress, and breach of Collective Bargaining Agreement (to the extent premised on plaintiffs' termination) claims against the Union.

## VI.    Conclusion

WHEREFORE, plaintiffs' Motion to Remand [Doc. 37] is denied; the Motion to Dismiss of defendants Tulsa Cement LLC, Eagle Materials, Inc., and Jake Medrano [Doc. 20] is granted in part and denied in part; and the Motion to Dismiss of defendants Kristopher Todd Brown and Tommy Keller [Doc. 23] is granted.

All claims against the individual defendants—Kristopher Todd Brown, Jake Medrano, and Tommy Keller—are dismissed and the individual defendants shall be terminated as parties.  The Motion to Dismiss of defendants Tulsa Cement LLC, Eagle Materials, Inc. and Jake Medrano [Doc. 20] is denied with respect to the breach of Collective Bargaining Agreement claim asserted against Tulsa Cement, Eagle Materials, and the Union—but only to the extent premised on miscellaneous breaches of the Collective Bargaining Agreement.  The motion is otherwise granted, and all other claims are dismissed.

IT IS SO ORDERED this 11th day of January, 2019.

GREGORY K. FRIZZELL, CHIEF JUDGE